Argued and submitted January 5, affirmed on appeal; reversed and remanded on
cross-appeal October 13, 1999

Roschelle M. BROWN,
Personal Representative of
the Estate of Stephen Dale Brown,
*Respondent - Cross-Appellant,*

*v.*

WASHINGTON COUNTY,
*Appellant - Cross-Respondent,*

*and*

Carla G. PAVLICEK
and Charles R. Brown,
*Defendants.*

(C960165CV; CA A98379)

987 P2d 1254

William G. Blair argued the cause and filed the briefs for appellant - cross-respondent.

Michael Charles Zusman argued the cause for respondent - cross-appellant. With him on the briefs were Evans & Zusman and Vincent J. Bernabei.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

HASELTON, J.

**HASELTON, J.**

Defendant Washington County appeals from a judgment in a negligence action arising from an incident in which an inmate, Charles Brown, escaped from the Washington County Community Corrections Center and killed his brother, Stephen Brown. Defendant[1] assigns error to the trial court's denial of its motions for directed verdict or judgment notwithstanding the verdict (JNOV) on issues of liability under section 319 of the *Restatement (Second) of Torts* (1965) and principles of general foreseeability. Plaintiff, Stephen Brown's personal representative and widow, cross-appeals, asserting that the court erred in submitting the issue of Charles Brown's proportionate fault to the jury and consequently reducing plaintiff's judgment against defendant. We affirm on the appeal and reverse and remand on the cross-appeal.

We first consider the appeal.[2] In February 1993, Washington County Parole Officer Cynthia Mazikowski was assigned to supervise Charles Brown (Brown), who was on parole for two convictions of burglary in the first degree and one conviction of forgery in the first degree. Brown had a lengthy juvenile and criminal record extending back to 1977, which included adult convictions for multiple burglaries, forgery, escape, theft, and driving while suspended, as well as arrests for delivery of methamphetamines, other burglaries, and forgery.[3] Mazikowski was assigned as Brown's parole officer because she specialized in supervising sex offenders

---

[1] The complaint also named as defendants Charles Brown and Carla Pavlicek. The trial court entered pretrial orders of default as to both Brown and Pavlicek and later entered default judgments as to both. Neither Brown nor Pavlicek is a party to this appeal. Consequently, "defendant" in this opinion refers solely to Washington County.

[2] In reviewing the denial of defendant's directed verdict and JNOV motions, we view the evidence and all inferences that may reasonably be drawn from the evidence in the light most favorable to plaintiff. *Greist v. Phillips*, 322 Or 281, 285, 906 P2d 789 (1995).

[3] Brown's juvenile record reflected a history of assaultive conduct, including charges of attempted assault in the first degree in January 1978, reckless endangerment following an escape from MacLaren in September 1978, and assault at MacLaren in November 1979.

and Brown's record suggested that he had targeted and burglarized residences where he knew women lived and, on several such occasions, had rifled through women's underwear and lingerie, apparently for sexual gratification. Mazikowski received a psychological evaluation of Brown, and, based on that report, she began actively investigating the possibility that he had committed rapes in connection with several of the residential burglaries.

During the time Mazikowski supervised Brown, he was "basically noncompliant" with the conditions of his parole, including driving under the influence of intoxicants and testing positive for cocaine. Both Multnomah and Clackamas counties contacted Mazikowski to inform her that Brown was under investigation for armed robberies.

In April 1993, Brown was arrested for assault and domestic violence involving his then-girlfriend, Carla Pavlicek. The police report of that incident, which Mazikowski obtained, stated that a witness saw Brown pulling on Pavlicek as she tried to get her car keys, and, when the witness attempted to intervene, Brown hit him in the face with a beer bottle.

In May 1993, Brown was again arrested for domestic violence against Pavlicek. The police report of that incident, which Mazikowski obtained, stated that Brown hit Pavlicek in the face twice and, when a neighbor attempted to prevent Brown from leaving until the police arrived, Brown twice attempted to run him down with his car, ultimately hitting and injuring the neighbor. In December 1993, Brown was convicted of two counts of reckless endangerment stemming from the May incident and sentenced to 10 days in jail and one year of probation, with conditions of "no contact" with both Pavlicek and the neighbor. Following that conviction, Brown informed Mazikowski that he and Pavlicek had separated and that he would no longer reside at her home in Aloha.

About a month later, on January 10, 1994, Brown was arrested by a Forest Grove police officer on two Marion County warrants (one for a probation violation and one for failure to appear for a hearing on a theft charge), as well as new charges of theft and driving while suspended. Brown

was sentenced to Marion County's work release program for 60 days.

On January 13, 1994, Brown and Pavlicek were married in Hillsboro. They told no one of their marriage, including Mazikowski and Brown's brother, Stephen.

On February 1, 1994, Pavlicek contacted Mazikowski to ask her if she could arrange to have Brown transferred from Marion County to the Washington County Community Corrections Center (also known as the Restitution Center) so that he could start work at a job he had lined up in Hillsboro. Mazikowski agreed and made the necessary arrangements. On the afternoon of February 10, 1994, Brown was transferred from the Marion County work release program to the Restitution Center.

The Restitution Center is a minimum security facility. It houses 120 adult residents and is intended to provide criminal offenders with a temporary structured living environment to help them make a successful transition from jail into the community. Residents of the Restitution Center stay an average of 30 days, usually either before they reenter the community at the end of a jail sentence or following a parole violation. During the day, the doors to the Restitution Center are unlocked, and the residents are permitted to leave for certain purposes, such as to work, to attend treatment programs, or to search for employment. At night, the doors to the Restitution Center are locked. According to the Restitution Center's written policy, staff members inspect the entire facility and physically observe each resident at least six times each day.

Early on the evening of his arrival at the Restitution Center, Brown tried unsuccessfully to make two collect calls. Steve Rohan, the Restitution Center security guard on duty, noticed that Brown seemed "preoccupied" and "uneasy." Rohan was curious about Brown's state of mind and, after asking some of the other residents, he learned that Brown thought that someone "was fooling around with his old lady." At approximately 10:00 p.m. that evening, Brown escaped from the Restitution Center through an unlocked second story window.

At some point during the night, the Restitution Center staff became aware that Brown had escaped from the facility. An unknown Restitution Center staff member[4] called Mazikowski to inform her of Brown's escape. Mazikowski told the caller that she considered Brown "high risk or dangerous" and that she thought a temporary warrant should be issued immediately. Mazikowski also informed the caller that she thought that Brown would "most likely" go to Pavlicek's house, and she waited on the line for a few minutes for the caller to confirm that the Restitution Center had Pavlicek's address in Aloha. According to Mazikowski, the caller told her that they (the Restitution Center staff) would take care of getting a temporary warrant for Brown. In fact, the Restitution Center staff did not request a temporary warrant for Brown. Nor is there any evidence that corrections personnel attempted to call or otherwise contact Pavlicek. No warrant was issued until Mazikowski requested a warrant from the Parole Board on February 17, seven days after Brown's escape.

After leaving the Restitution Center, Brown went by bus and on foot to Pavlicek's home, where he saw his brother Stephen's truck in the driveway. After sitting in his car (which had been parked there) for some time, Brown approached the house and heard Pavlicek and his brother engaging in sexual relations. At that point, Brown cut the telephone lines to the house because he was "on escape from the RC and didn't want them calling." Some time later, Brown entered the house and waited downstairs until approximately 1:00 a.m. He then picked up an axe that he found by the door, went upstairs to the bedroom where Pavlicek and Stephen Brown were sleeping, and killed Stephen with a single axe blow to the neck.

Over one week later, Stephen Brown's body was found in Battleground, Washington. Charles Brown was arrested on February 24, 1994, after the police found him

---

[4] Plaintiff's evidence regarding the timing, sequence, and nature of events at the Restitution Center on the night of Brown's escape is derived wholly from the testimony of Mazikowski and the security guard, Rohan. Plaintiff attributes her lack of additional evidence to the fact that the Restitution Center file containing all records on Brown, as well as the events of February 10, 1994, was either lost or "inadvertently destroyed" by defendant.

hiding in an upstairs bathroom at Pavlicek's house. Brown was ultimately convicted of aggravated murder and sentenced to life without possibility of parole.

Plaintiff filed this action in February 1996, alleging that defendant was negligent in five particulars: (1) failing to properly supervise Brown; (2) failing to prevent Brown's escape from the Restitution Center; (3) failing to notify law enforcement authorities of Brown's escape in a timely manner; (4) failing to apprehend Brown or to take reasonable steps to apprehend him; and (5) failing to notify Brown's family, including Stephen Brown, of his escape in a timely manner. The case was tried to a jury for three days in March 1997. At the close of the evidence, defendant moved for a directed verdict against each of plaintiff's specifications, arguing, primarily, that plaintiff had failed to present legally sufficient evidence that defendant should have foreseen from Brown's history that he was a risk to escape from the Restitution Center and murder his brother. The court denied that motion but, at defendant's request, and over plaintiff's objections,[5] agreed to submit to the jury the issue of Brown's proportionate fault.

The jury returned a general verdict for plaintiff, awarding $97,359 in economic damages and $305,556 in noneconomic damages. The jury further determined that Charles Brown was 82 percent at fault for Stephen Brown's death and that defendant was 18 percent responsible. Based on that apportionment, the court entered judgment against Brown and defendant, jointly and severally, for economic damages of $97,359, against defendant for 18 percent of plaintiff's total noneconomic damages, $55,000.08, and against Brown for 82 percent of the total noneconomic damages, $250,555.92. Defendant moved for a JNOV, reiterating its arguments for a directed verdict, and that motion was denied by operation of law. ORCP 63 D.

---

[5] Plaintiff objected to the jury's allocation of fault between defendant and Brown on the grounds that (1) defendant failed to plead comparative fault as an affirmative defense; and (2) Brown was not a party at trial for purposes of comparative fault. That ruling is the subject of plaintiff's cross-appeal, which we address below.

Before addressing the particulars of defendant's arguments on appeal, we highlight three procedural/contextual considerations that, in turn, shape our discussion of the merits.

■     *First*, as noted, plaintiff pleaded, and the jury considered, five specifications of negligence: (1) failure to properly supervise Brown; (2) failure to prevent Brown's escape from the Center; (3) failure to notify law enforcement authorities of Brown's escape in a timely manner; (4) failure to apprehend Brown or to take reasonable steps to apprehend him; and (5) failure to notify Brown's family, including Stephen Brown, of his escape in a timely manner. Defendant unsuccessfully moved for a directed verdict against each of those specifications, and the jury returned a general verdict. Thus, under the "we can't tell" rule, if *any* of plaintiff's specifications is deficient, we must reverse and remand. *Whinston v. Kaiser Foundation Hospital*, 309 Or 350, 788 P2d 428 (1990).

*Second*, the parties agree on appeal that the sufficiency of plaintiff's first four specifications of negligence, the so-called "custodial negligence" specifications, is governed *solely* by reference to section 319 of the *Restatement (Second) of Torts*. That is, unlike in *Washa v. DOC*, 159 Or App 207, 979 P2d 273 (1999), plaintiff does not assert that, even if her proof of those specifications were somehow deficient under section 319, she could nevertheless prevail under the "general foreseeability" principles announced in *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987).[6] Conversely, as framed on appeal, the sufficiency of plaintiff's fifth, "failure to warn" specification is determined *solely* by reference to *Fazzolari*'s reasonable foreseeability, and section 319 is inapposite. Defendant does not dispute the *general* applicability of principles of general foreseeability to that specification.

---

[6] *Cf. Washa*, 159 Or App at 221 n 20 (noting that, under *Faverty v. McDonald's Restaurants*, 133 Or App 514, 892 P2d 703 (1995), *rev dismissed* 326 Or 530 (1998), failure to establish liability under section 319 does not preclude resort to principles of general foreseeability); *see also id.* at 226-28 (De Muniz, P. J., concurring) (acknowledging *Faverty*'s reasoning but urging contrary view).

*Third,* unlike in *Washa* or *Kim v. Multnomah County,* 328 Or 140, 970 P2d 631 (1998), defendant here does *not* contend that it had not "take[n] charge" of Brown for purposes of section 319 liability. Rather, at trial, defendant's counsel conceded that "the Restitution Center had taken charge of Charles Brown" for purposes of the section 319 analysis, and defendant does not dispute that element on appeal. Given that posture, we imply no view as to the proper disposition if that issue had been disputed.

■    Returning to the merits, we begin with defendant's challenge to the sufficiency of the four "custodial negligence" specifications under section 319.[7] That section provides:

> "One who takes charge of a third person *whom he knows or should know to be likely to cause bodily harm to others if not controlled* is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." *Restatement (Second) of Torts* § 319 (emphasis added).

Thus, section 319 liability requires proof that (1) the defendant had "taken charge" of the third person; (2) the defendant knew or should have known that that third person was likely to cause bodily harm to others if not controlled; and (3) the defendant failed to exercise reasonable care to control the third person to prevent that person from doing harm to others. *See Buchler v. Oregon Corrections Div.,* 316 Or 499, 506, 853 P2d 798 (1993).

As noted, defendant here does not dispute the first, "take charge," element. Nor does defendant challenge the sufficiency of plaintiff's evidence of the third element, failure to exercise reasonable care. Rather, defendant frames the section 319 issue on appeal narrowly and precisely: "Under the facts of this case, the controlling question is whether defendant knew or should have known that the prisoner was 'likely to cause bodily harm to others if not controlled.' "

---

[7] In addition to the denial of its directed verdict and JNOV motions, defendant also challenges the trial court's denial of its motion for summary judgment on questions of liability. However, in an appeal from a judgment after trial, the denial of a motion for summary judgment is not reviewable unless the motion raised only an issue of law about which the facts found at trial could have made no difference. *See Payless Drug Stores Northwest v. Brown,* 300 Or 243, 708 P2d 1143 (1985). Defendant's motion for summary judgment involved factual issues, and the trial court's denial is therefore not reviewable on appeal.

■ Defendant argues that it did not know, or have reason to know, that Brown was likely to cause harm to others if not controlled, because, like the prisoner in *Buchler*, Brown's history of criminal convictions consisted "almost entirely of property crimes." Plaintiff responds that, in light of Brown's lengthy criminal history, including violent crimes against persons, defendant's knowledge of that history, and defendant's knowledge that Brown was agitated because he suspected that his wife was having sexual relations with another man, defendant either knew or had ample reason to know that Brown would cause bodily harm to others if not controlled. We agree with plaintiff.

The Supreme Court's analysis in *Buchler* is instructive. There, a prisoner with a criminal record "includ[ing] the property crimes of unauthorized use of motor vehicles and burglary but not any crimes of violence," 316 Or at 502, escaped from a work camp by driving away in the state's van in which the crew supervisor had left the ignition keys. The inmate drove 50 miles to his mother's house, where he stole a gun and then shot two people in the nearby woods. His victims sued the Oregon Corrections Division for negligence, arguing, *inter alia*, that the Division had breached its section 319 duty by failing to prevent the prisoner from escaping and causing harm to the plaintiffs.[8] The court first stated that, because there was no dispute that the defendant had "take[n] charge" of the prisoner, the controlling question was whether the defendant knew or should have known that the prisoner was " 'likely to cause bodily harm to others if not controlled.' " *Id.* at 507. The court concluded:

> "[T]he prisoner's criminal record only concerned property crimes, not acts of violence. * * * We do not think that a childhood temper problem or even long drug use, without more, permits a reasonable juror to infer that this prisoner was 'likely to cause bodily harm to others.' It is not possible to find from this record that a custodian would have known

---

[8] The plaintiffs in *Buchler* also asserted that the defendant was liable under principles of general foreseeability for (1) leaving the keys in the ignition of the van that the criminal used to escape; and (2) failing to warn the plaintiffs of the prisoner's escape. The court treated the section 319 "failure to prevent escape" claim and the two "general foreseeability" negligence claims as three separate and analytically distinct issues. *See Washa*, 159 Or App at 216 n 14.

that this particular prisoner was 'likely to cause bodily harm' of the kind that befell plaintiffs two days after his escape." *Id.* at 507.

No subsequent Oregon case has addressed whether a defendant knew or should have known that a third party "was likely to cause bodily harm to others if not controlled" for purposes of section 319.

Thus, the inquiry required by *Buchler* is whether a reasonable juror could find that, in light of the third party's criminal history and defendant's knowledge of that history, defendant "knew or should have known" that Brown was "likely to cause bodily harm to others."

Here, we conclude that a reasonable juror could find that defendant knew or should have known that Brown was likely to cause bodily harm to others if not controlled. Our conclusion in that regard flows from the premise that the combined knowledge possessed by Washington County Corrections personnel and, specifically, Parole Officer Mazikowski and employees of the Restitution Center, including Rohan, is properly *collectively* imputed to defendant. Defendant does not dispute that collective knowledge premise.

In particular, evidence at trial showed the following: (1) Mazikowski was familiar with Brown's entire criminal history, which included violent assaultive conduct. (2) During Mazikowski's supervision of Brown in 1993, he was arrested for one assault and arrested and convicted of two counts of reckless endangerment. Mazikowski was familiar with those incidents, both of which involved violence against Pavlicek and bystanders who attempted to intervene to assist Pavlicek. (3) Mazikowski suspected Brown of violent sex crimes and believed "that he was a danger to the community at the time he escaped on February 10, 1994." Indeed, Mazikowski described Brown as "high risk or dangerous" to the Restitution Center staff member who called to inform her of his escape. (4) Rohan, the Restitution Center security guard, knew that, on the evening of his escape, Brown was preoccupied and uneasy because he thought his wife was being unfaithful. Based on defendant's collective knowledge of the foregoing facts, a reasonable juror could conclude that defendant knew or should have known that Brown was likely

to cause bodily harm to others if not controlled. Accordingly, the trial court correctly denied defendant's motion for directed verdict with respect to the four "custodial negligence" specifications.

We turn to the sufficiency of plaintiff's fifth "failure to warn" specification, under principles of general foreseeability. *See Fazzolari,* 303 Or at 17. Under *Fazzolari* and its progeny:

> "[I]n the absence of a duty arising from [statute, status, or relationship], a defendant may be liable for conduct which is unreasonable in the circumstances if that conduct results in harm to a plaintiff and the risk of harm to the plaintiff or the class of persons to whom the plaintiff belongs was foreseeable." *Fuhrer v. Gearhart By The Sea, Inc.,* 306 Or 434, 437, 760 P2d 874 (1988).

Defendant argues that plaintiff's proof was insufficient not only because Brown's assaultive conduct was *generally* unforeseeable but also because "no reasonable person could find that Washington County would have or should have known that Charles Brown would murder his own brother."[9] Plaintiff responds that, under *Buchler,* it need only show that it was foreseeable to defendant that Brown would engage in assaultive conduct and that "Stephen [Brown] was *in the class of persons at risk of bodily harm,*" (emphasis added), as a result of defendant's failure to warn of Brown's escape. Plaintiff contends that a reasonable person could conclude that Stephen Brown was in the class of persons at risk because (1) given Charles Brown's history of domestic violence, specifically including violence towards bystanders, any person at Pavlicek's home was a foreseeable victim of Brown's assaultive conduct; and (2) any man sleeping with Pavlicek was a foreseeable victim of Brown's assaultive conduct. Again, we agree with plaintiff.

*Buchler* is again instructive. There, in addition to their allegations of liability based on section 319, the plaintiffs alleged that the state negligently failed to warn persons

---

[9] Defendant does not dispute on appeal plaintiff's proof of causation-in-fact—*i.e.,* that Brown would never have murdered his brother if defendant had warned all members of Brown's immediate family, including Pavlicek and Stephen Brown, of his escape from the Restitution Center.

in the vicinity of the escaped prisoner's mother's home of the prisoner's escape from the prison camp work site. *Buchler*, 316 Or at 514. The Supreme Court concluded that the trial did not err in granting defendant's motion for summary judgment, reasoning:

> "Plaintiffs did not produce evidence that defendant here either knew nor had reason to know of the specific danger presented by the prisoner to plaintiffs. Defendant had no duty to warn in the absence of that knowledge, because it was not reasonably foreseeable that the escapee posed a risk of harm to *persons in plaintiffs' position*." *Id.* at 516 (emphasis added).

Thus, proof of negligent failure to warn requires proof that (1) defendant knew or had reason to know of the specific danger presented; and (2) plaintiff was within the class of persons at risk for that harm.[10] *Id.*; *see also Washa*, 159 Or App at 225 ("[O]ur general foreseeability analysis in a negligent supervision claim properly turns on whether—in light of the third party's criminal history—the defendant could reasonably foresee that the third party, if inadequately supervised, would engage in the kind of criminal conduct that ultimately harmed the plaintiff.").

We have already concluded, for purposes of our section 319 analysis, that a reasonable juror could conclude that defendant knew or had reason to know that Brown was likely to engage in violent conduct. Thus, the question of whether defendant can be held liable for failure to warn under principles of general foreseeability reduces to whether the jury could conclude that defendant's failure to warn unreasonably created a foreseeable risk that Brown would violently assault *persons in Stephen Brown's position*.

Plaintiff's proof in that regard, which overlapped her proof of liability under the section 319-based specifications,

---

[10] In this case, the trial court's general foreseeability instruction to the jury provided:

> "First, the plaintiff must be within the general class of persons that one reasonably would anticipate might be threatened by the defendant's conduct. Second, the harm suffered must be within the general class of harms that one reasonably would anticipate might result from the defendant's conduct."

Defendant does not assign error to that instruction.

established: (1) Defendant knew, at the time of Brown's escape, that, immediately before his escape, Brown was uneasy and agitated because he suspected that Pavlicek was having an adulterous affair. (2) Pavlicek's home was Brown's last-known address at the time of his escape, and Mazikowski told the Restitution Center that he would "most likely" go to Pavlicek's home on the night of February 10, 1994. (3) Brown had a recent history of domestic violence towards Pavlicek and had twice in the previous months assaulted men who attempted to intervene on Pavlicek's behalf. Given that evidence, a reasonable juror could conclude that any man at Pavlicek's home was a foreseeable target of Brown's violence.[11]

The trial court correctly denied defendant's motions for directed verdict and JNOV. Accordingly, we affirm on the appeal.

Before addressing the merits of plaintiff's cross-appeal, we recount the pertinent procedural history. Plaintiff filed her original complaint in this action in February 1996, naming both Washington County and Charles Brown as defendants on the wrongful death claim. Brown failed to file any answer or response, and, accordingly, the trial court entered an order of default against him in August 1996. No default judgment was entered against Brown until after trial.

Before trial, defendant requested that the jury be instructed to allocate fault for Stephen's death between the County and Brown, arguing that "the fact that [Brown] defaulted and [isn't] here doesn't affect the county's right to point to [him] and have the jury compare their fault on a verdict form. Otherwise, we're talking about the county's negligence in a vacuum." Plaintiff objected to this request, arguing, *inter alia*, that it was barred by ORCP 19 B because defendant did not raise comparative negligence as an affirmative defense. The trial court ruled in favor of defendant, and, at the end of trial, the jury was instructed to assign a percentage of fault to any defendant found at fault.[12] The jury returned the following verdict form:

---

[11] Moreover, as noted, Mazikowski deemed Brown to be "high risk or dangerous" and "a danger to the community at the time he escaped."

[12] The jury was instructed:

"Question 1:   Was defendant Washington County negligent as claimed by plaintiff, and if so, was such negligence a substantial factor in causing the decedent's death?

"Answer:   Yes.

"Question 2:   What is the percentage of each party's fault?

"Answer:

| | |
|---|---|
| Washington County: | 18% |
| Charles Brown: | 82% |
| Total | 100% |

"Question 3:   What are the total money damages to decedent's estate?

"Answer:

| | |
|---|---|
| Economic Damages | $ 97,359 |
| Noneconomic Damages | $305,556 |
| Total: | $402,915" |

The trial court then entered judgment against defendants Washington County and Charles Brown, jointly and severally, for the total amount of economic damages, $97,359, against Washington County for 18 percent of the total noneconomic damages awarded, $55,000.08, and against Charles Brown for 82 percent of the total noneconomic damages, $250,555.92.

■■   On cross-appeal, plaintiff assigns error to both the verdict form requiring the jury to allocate the relative fault of the County and Charles Brown in causing Stephen's death and to the trial court's entry of judgment reflecting the jury's apportionment of fault.[13] We review the trial court's rulings for errors of law. *Davis v. O'Brien*, 320 Or 729, 891 P2d 1307 (1995).

Plaintiff advances two alternative arguments. First, relying on ORCP 19 B, plaintiff argues that "the County's failure to assert Charles' fault as an affirmative defense

---

"If you find that the plaintiff is entitled to a verdict, the damages you award will be apportioned by the judge among the defendants as follows: Any defendant whom you find to be at fault will be liable for the plaintiff's damages, but only in proportion to that defendant's percentage of fault."

[13] Plaintiff does not assign error to the court's instruction regarding apportionment of fault. *See* n 5 herein. That failure does not, however, preclude our review of the propriety of the court's allowance of apportionment. *See Davis v. O'Brien*, 320 Or 729, 891 P2d 1307 (1995).

barred allocation of fault in the jury verdict and judgment." Second, plaintiff argues that ORS 18.480 (1993) barred the jury from assigning fault to Brown because a default order was entered against him before trial. We do not reach plaintiff's first argument because we agree with her that ORS 18.480 (1993) barred the jury in this case from assigning fault to Brown.

■■ Whether the trial court's allowance of allocation of fault in the jury verdict and judgment violated ORS 18.480 (1993) is a matter of statutory construction. Following the analytical framework required by *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), we look first to the text and context of the statute. The text of the statutory provision itself is the starting point for interpretation and is the best evidence of the legislature's intent. *Id.* Only if the text and context could reasonably bear more than one construction do we examine legislative history to discern legislative intent. *Id.*

**10.** ORS 18.480 (1993)[14] provides, in relevant part:

"(1) When requested by any party the trier of fact shall answer special questions indicating:

"* * * * *

"(b) The degree of each party's fault expressed as a percentage of the total fault attributable *to all parties represented in the action.*" (Emphasis added.)

Plaintiff argues that the plain meaning of the phrase "represented in the action," taken together with prior Supreme Court interpretations of that language, precludes application of ORS 18.480 (1993) to a defaulted party. Defendant responds that ORS 18.480 (1993) applies to "all parties"

---

[14] In 1995, the legislature amended ORS 18.480, Or Laws 1995, ch 696, § 4, but made that amendment effective only as to causes of action arising on or after its effective date. Or Laws 1995, ch 696, § 7. Therefore, we apply the version in effect when this cause of action arose. ORS 18.840 (1993).

The amended version of ORS 18.480 no longer restricts the jury's comparative fault determination to the fault of "parties represented in the action." ORS 18.480 (1993). Under the current version of the statute, the trier of fact considers "the fault of any party against whom recovery is sought, the fault of third party defendants who are liable in tort to the claimant, and the fault of any person with whom the claimant has settled." ORS 18.470; *see also* ORS 18.480.

to the action at the time the case goes to the jury, and that Brown was still a "party" in the action because a final judgment had not been entered against him.

We agree with plaintiff that the plain meaning of the phrase "all parties represented in the action" suggests that the legislature intended only for the fault of those parties who actually appear at trial, in some manner, to be allocated by the jury. The phrase "all parties represented in the action" must describe a narrower set than all the parties to an action; otherwise the term "represented" is meaningless and repetitive. The verb "represent" is defined, *inter alia*, as "to bring clearly before the mind," "to set forth or place before someone," or "to state with advocacy or with the design of affecting action or judgment." *Webster's Third New Int'l Dictionary*, 1926 (unabridged ed 1993). Thus, the term "represented," as it is used in ORS 18.480 (1993), is arguably ambiguous in that it does not specify the form or extent of representation to which it refers (*i.e.*, representation by counsel, *pro se* representation by a party, etc.). Nonetheless, we are satisfied that that term describes only parties whose interests are "represented" by *some* form of appearance, and that, given even minimal content, "represented" cannot be interpreted to apply to a party who completely fails to appear in an action.

The Supreme Court's prior interpretations of ORS 18.480 (1993), while not precisely controlling, comport with our understanding that the phrase "all parties represented in the action" does not apply to all *parties*, but to all parties who have appeared and participated in some way at trial. *See Mills v. Brown*, 303 Or 223, 735 P2d 603 (1987). In *Mills*, the plaintiff, who was injured in a three-vehicle accident, brought a personal injury action against three defendants. Before trial, one of the defendants voluntarily settled with the plaintiff. In accordance with the jury form, the jury set the plaintiff's fault at 45 percent and the remaining defendants' fault at 55 percent, but did not consider the fault of the defendant who had settled. Because the amount that the plaintiff received from the settling defendant exceeded 55 percent of the plaintiff's total damages, the trial court entered judgment for the remaining defendants. Plaintiff appealed, arguing that the trial court erred in not instructing

the jury to consider the fault of the settling defendant in making the comparative fault analysis.

After an extensive review of the comparative fault statutory scheme, the Supreme Court affirmed the trial court's jury instructions:

> "We infer that the legislature intended to include in a comparative fault analysis only a person still a party at the time the fact-finder makes the comparative fault decision. Because ORS 18.480 [1993] expressly provides that when requested by a party, 'the trier of fact shall answer special questions indicating * * * the degree of each parties' fault expressed as a percentage of the total fault attributable *to all parties represented in the action*,' a once-named party who settles a case prior to or during trial is no longer a party in the action." *Mills*, 303 Or at 230-31 (emphasis in original).

In reaching that conclusion, the court relied heavily on the fact that ORS 18.480 (1993) permits allocation of fault only between parties "represented" at trial. *Id.* That language, the court reasoned, was "in direct conflict with [the] practice of requiring the trier of fact to assess percentages of causal negligence to persons who are not parties at trial *and who are not represented in the action*." *Id.* at 230 (emphasis added); *see also Davis*, 320 Or at 740.

Defendant argues that the holding in *Mills* is inapplicable here, because, even though an *order* of default was entered against Brown before trial, he was still a *party* to the action at the time the case was submitted to the trier of fact because no final judgment had been entered against him. That argument is unavailing. While defendant Brown remained a party to the action when the case was submitted to the jury, he made no appearance in the action and thus was not a party "*represented* in the action," as ORS 18.480 (1993) expressly requires.

In light of the plain meaning of ORS 18.480 (1993), we conclude that the trial court erred in using a verdict form requiring the jury to assign fault to Brown, a defaulted party, and in entering judgment to reflect the jury's apportionment of fault to Brown. Accordingly, we reverse on the cross-appeal

and remand for entry of judgment against the County consistent with this opinion.

Affirmed on appeal; reversed and remanded on cross-appeal.